# In the United States Court of Federal Claims

No. 15-1438C

Filed: September 8, 2016

| | |
|---|---|
| * * * * * * * * * * * * * * * * * *  *<br>**KEVIN J. JEUN,**  *<br>  *<br>Plaintiff,  *<br>  *<br>v.  *<br>  *<br>**UNITED STATES,**  *<br>  *<br>Defendant.  *<br>  *<br>* * * * * * * * * * * * * * * * * *  * | Veteran Disability Benefits; Physical Disability Board of Review; Veterans Affairs Disability Rating; Statute of Limitations |

**William E. Cassara**, Counsel for Plaintiff, Evans, GA.

**Eric P. Bruskin**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him are **Benjamin C. Mizer**, Principal Deputy Assistant Attorney General, **Robert E. Kirschman, Jr.**, Director, **Steven J. Gillingham**, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of Counsel was **Major Patrick McGrath**, Litigation Attorney, Military Personnel Law Branch, United States Army Legal Services Agency.

## O P I N I O N

### FINDINGS OF FACT

Plaintiff Kevin J. Jeun (formerly Chihwan or Chi Jeun) filed a complaint in this court alleging an unlawful denial of military disability compensation. Before the court is defendant's motion to dismiss for lack of subject matter jurisdiction. Defendant argues that plaintiff's claim is barred by the statute of limitations, and further argues that the plaintiff cannot establish a basis to toll the statute.

Plaintiff entered active duty in the United States Army on March 31, 2005. In June 2006, plaintiff deployed to Iraq. In March 2007, after ten months in Iraq, plaintiff was medically evacuated from theater after having been hospitalized for two days due to odd behaviors, symptoms of isolation, withdrawal, mumbling to himself, and staring at his hands for long periods of time while crying. After arriving at Landstuhl Regional Medical Center in Germany, imaging revealed a ruptured dermoid cyst in his left temporal lobe

region.[1] Plaintiff was placed on antidepressants and antipsychotics, then underwent successful neurosurgery to remove the cyst on April 19, 2007.

A few weeks after his surgery, plaintiff had consultations with Drs. Dennis Kelly and Brett Theeler on May 7, 2007 and May 8, 2007. Dr. Kelly, a neuropsychologist, found that plaintiff "showed slowness in motor functioning, along with mildly compromised recall of stories and time verbal fluency," but "[o]therwise, he performed remarkably well given his recent left brain surgery." Dr. Kelly found that plaintiff met military retention criteria, "from a neuropsychological point of view alone." Dr. Theeler, a neurologist, diagnosed plaintiff with "Medial Frontal Syndrome: manifested by apathy, impaired motivation, diminished spontaneous speech, deficits of sustained attention and executive function, expressive aprosodia, and impaired social interaction," as well as a ruptured intracranial dermoid and a subdural hygroma. Dr. Theeler found that plaintiff did not meet retention standards on the grounds that he "would not be able to operate in operational or other stressful environments" and that he needed "immediate access to psychiatric, neurologic, and cognitive rehabilitation thus limiting potential duty sites."

Plaintiff met with Dr. Simon Pincus, a psychiatrist, on August 7, 2007, September 5, 2007, and October 12, 2007. After each of these consultations, Dr. Pincus assessed plaintiff with "Cognitive Disorder NOS[ Not Otherwise Specified]/Medial Frontal Lobe Syndrome." Dr. Pincus also noted that plaintiff had a "History of Psychosis secondary to Dermoid Cyst," but that this was "resolved" and that plaintiff "does not appear actively psychotic or grossly disorganized." Dr. Pincus similarly noted that plaintiff had a "History of Depression," but that this too was "resolved."

In October 2007, plaintiff got lost changing units and went to stay in a hotel instead of his new barracks. Plaintiff was Absent Without Leave (AWOL) for three weeks before his command was able to figure out where he was. After meeting with plaintiff, Dr. Pincus provided a note for plaintiff's command stating:

> SPC Chi Jeun has cognitive disorder which impairs his ability to follow directions unless very clearly communication [sic] verbally or in writing. He has consistently indicated that he desires to return to family in New York. Given this, I believe that his decision to stay in a hotel does not represent AWOL, rather a misunderstanding secondary to his clinical condition.

On February 8, 2006, a Medical Evaluation Board (MEB),[2] after considering plaintiff's clinical records, laboratory findings, and physical evaluation, found that plaintiff

---

[1] A dermoid cyst is a "type of epidermal cyst, usually present at birth . . . , usually involv[ing] the head or neck . . . ." Dorland's Illustrated Medical Dictionary 458 (32nd ed. 2012).

[2] An MEB is

> convened to document a Soldier's medical status and duty limitations insofar as duty is affected by the Soldier's status. A decision is made as to

2

had the following medical conditions: "1. Cognitive disorder NOS . . . . 2. Psychotic NOS. . . . 3. Medial Frontal Lobe Syndrome Secondary to ruptured intracranial dermoid cyst. . . . 4. Depressive disorder. . . ." The MEB determined that each of these conditions was incurred while plaintiff was entitled to base pay and that none existed prior to service. Based on these findings, the MEB referred plaintiff to a Physical Evaluation Board (PEB).[3]

On March 3, 2008 an informal PEB assigned plaintiff a ten-percent disability rating based on plaintiff's psychosis. Such a rating entitled plaintiff to separation pay, but not to medical retirement benefits. See 10 U.S.C. §§ 1201, 1203 (2012). In order to secure long-term medical retirement benefits, a soldier must be rated with at least a thirty-percent disability rating. 10 U.S.C. § 1201(b)(3)(B). The informal PEB decision stated its reasoning for assigning the ten-percent rating as follows:

> Psychosis not otherwise specified, onset while deployed to Iraq where he served as an infantryman. Treated and now completely resolved. Unfit due to likelihood of recurrence in a high demand environment. Rated 10% for symptoms that decrease work efficiency and ability to perform occupational tasks only during times of significant stress.

The PEB may only rate an illness or injury that is service-incurred or permanently aggravated by military service. See 26 U.S.C. § 104 (2012). Plaintiff's "[c]ognitive disorder associated with medial frontal lobe syndrome" was deemed by the PEB to be congenital and, therefore, non-compensable. The PEB decision stated: "This condition is a direct result of a ruptured intracranial dermoid cyst, subdural hygroma, and surgical treatment. Dermoid cysts are caused when skin and skin structures become trapped during fetal development, and is thus congenital and not compensable . . . . Not rated."

On March, 18, 2008, plaintiff signed a form containing the PEB's conclusions and the following statement: "I HAVE BEEN ADVISED OF THE FINDINGS AND RECOMMENDATIONS OF THE PHYSICAL EVALUATION BOARD, AND HAVE RECEIVED A FULL EXPLANATION OF THE RESULTS OF THE FINDINGS AND RECOMMENDATIONS AND LEGAL RIGHTS PERTAINING THERETO AND . . . .,"

---

> the Soldier's medical qualification for retention based on the criteria in AR [Army Regulation] 40-501, chapter 3. If the MEB determines the Soldier does not meet retention standards, the board will recommend referral of the Soldier to a PEB [Physical Evaluation Board].

Army Reg. 635-40, ¶ 4-10 (Mar. 20, 2012).

[3] "PEBs are established to evaluate all cases of physical disability equitably for the Soldier and the Army." Army Reg. 635-40, ¶ 4-17(a) (Mar. 20, 2012). "Each case is first considered by an informal PEB. Informal procedures reduce the overall time required to process a case through the disability evaluation system. An informal Board must ensure that each case considered is complete and correct." Army Reg. 635-40, ¶ 4-20(a) (Mar. 20, 2012).

3

followed by a number of additional statements to which plaintiff could elect to agree. Through check marks, plaintiff elected: "I DO NOT CONCUR AND DEMAND A FORMAL HEARING"; that the formal hearing should be "WITH PERSONAL APPEARANCE"; and "I REQUEST A REGULARLY APPOINTED COUNSEL TO REPRESENT ME." Beneath these statements was the following additional statement, which was signed by Patti Johnson, whom the document refers to as a "COUNSELOR": "I have informed the soldier of the findings and recommendations of the Physical Evaluation Board and explained to him/her the result of the findings and recommendations and his/her legal rights pertaining thereto. The soldier has made the election(s) shown above."

On April 11, 2008, plaintiff met with his assigned legal counsel. After consulting with counsel and allegedly "realizing that a formal hearing would delay his discharge from the Army," plaintiff decided to withdraw his request for a formal PEB hearing and accepted the ten-percent rating. On the same day, April 11, 2008, plaintiff submitted to the Army Physical Evaluation Board in Tacoma, Washington a signed memorandum titled "Withdrawal of Demand for Demand for Formal Hearing *In the Matter of SPC Chi Jeun*."(emphasis in original). The memorandum stated:

> 1. Pursuant to AR 635-40, paragraph 4-21a, and after discussing my options with my legal counsel, I hereby withdraw my demand for the formal Physical Evaluation Board (PEB) hearing scheduled for 11 April 2008.
>
> 2. I do not contest the Informal PEB rating of 10%.
>
> 3. Pursuant to AR 635-40, paragraph 4-20f (2), should I discover any new or additional evidence, I reserve the right to submit a request for reconsideration.
>
> 4. The point of contact for this memorandum is my legal counsel, CPT Timothy Taylor . . . .

On April 18, 2008, plaintiff met with his case manager at a Transitioning Warrior clinic. After the meeting the case manager made the following note in plaintiff's record:

> CM [Case Manager] notified Ombudsman, David Smith assist to contact Counsel/Advisor to see if they would be willing to meet with SM [Service Member] again to ensure that SM is fully aware of his available options regarding the Board appeal. Mr Smith, SGT Brewer, Squad Leader, CPT Taylor and CM to discuss why SM did not complete his formal appeal today as he was advised to do by LTC Sutton at his last counsel meeting. Meeting was arranged and all of above met with Mr Steven Engle.
>
> SM was questioned why he changed his mind in deciding not to continue to formally appeal his Board. SM was given various possible outcomes that could result from his continuing with his formal appeal; possibly found fit for duty and possibly lose the present PEB election offer. SM did not want to be found fit for duty and remain in the Army and be delayed in his returning home and decided to decline the formal board hearing.

Plaintiff was honorably discharged from the Army on June 19, 2008 with an Army disability rating of ten percent. On July 1, 2013, plaintiff submitted an application to the Physical Disability Board of Review (PDBR),[4] requesting that it review the ten-percent disability rating assigned to him by the Army. In his application, plaintiff alleged that he declined the opportunity to appeal the informal PEB determination because he was "very stressed and [his] thoughts were only to get discharged." The PDBR declined to raise plaintiff's disability rating from ten percent. The PDBR decision reasoned that the thirty-percent rating sought by plaintiff was "difficult to support given that there is no documentation that psychotic symptoms interfered with daily functioning, and there was no evidence of occupational or social impairment due to psychosis."

Plaintiff filed a disability claim with the Department of Veterans Affairs (VA) on May 30, 2008, and on October 6, 2008, plaintiff initially was similarly assigned a ten-percent disability rating by the VA for "[s]ervice connection of psychosis."[5] Plaintiff subsequently petitioned the VA for increased disability ratings or benefits on June 13, 2008, April 7, 2009, April 27, 2009, August 16, 2012, and June 28, 2013. In response to plaintiff's June 13, 2008 petition, the VA confirmed the ten-percent rating for the service-connected psychosis, but altered the rating so that it was "now rated with cognitive disorder, residuals of brain lesion (claimed as dermoid cyst of left temporal lobe, cognitive problems, speech problems, traumatic brain injury and depression)." In response to plaintiff's April 7, 2009 petition, the VA increased plaintiff's VA disability rating for his psychosis with cognitive disorder from ten to seventy percent, based on what it now termed "mood disorder and psychotic disorder due to left fronto-temporal resection status post dermoid cyst rupture, previously rated as psychosis with cognitive disorder, residuals of brain lesion." The VA

---

[4] A Physical Disability Board of Review (PDBR) is "a board of review to review the disability determinations of covered individuals by Physical Evaluation Boards." 10 U.S.C § 1554a(a)(1) (2012). "The review by the Physical Disability Board of Review under paragraph (1) shall be based on the records of the armed force concerned and such other evidence as may be presented to the Physical Disability Board of Review." 10 U.S.C. § 1554a(c)(2) (2012).

[5] The VA's assignment of an increased disability rating does not dictate a similar increase in the military PEB findings, or a similar disability rating for calculating discharge benefits. As noted in the original PEB decision with regard to plaintiff's cognitive disorder, "Although the PDES [Physical Disability Evaluation System] cannot compensate [plaintiff] for this condition, [plaintiff] may still apply for a disability rating for it through the Department of Veterans Affairs (DVA), since they operate under different regulations and guidelines and may compensate any service- connected condition even if not unfitting at the time of separation." Both the VA and the military service branches now rely on the Veterans Administration Schedule for Rating Disabilities (VASRD), however, they do so in different ways.  The military uses the VASRD, "to determine fitness for performing the [military] duties of office, grade, and rank, whereas, at various times after discharge, the VA uses the VASRD to determine the disability ratings based on an evaluation of the individual's capacity to function and perform tasks in the civilian world."  Haskins v. United States, 51 Fed. Cl. 818, 826 (2002).

also granted plaintiff a status of individual unemployability "because [plaintiff is] unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." The same report also noted that plaintiff "appeared competent to manage [his] VA benefits in [his] own best interest." In response to his April 27, 2009 petition, the VA awarded plaintiff an additional, separate, ten-percent rating for a traumatic brain injury. In response to plaintiff's August 16, 2012 petition, the VA found that plaintiff was entitled to neither "special home adaption," nor "specially adapted housing." Finally, in response to plaintiff's June 28, 2013 petition, the VA raised plaintiff's rating for his mood disorder and psychotic disorder from seventy percent to one hundred percent and noted that it was "now also claimed as major depressive disorder and posttraumatic stress disorder." The VA also granted plaintiff additional, separate, ratings of thirty percent for the size and location of plaintiff's scar resulting from the removal of his temporal dermoid cyst and ten percent for the pain resulting from this scar.[6]

Plaintiff filed his complaint in this court on December 1, 2015, more than seven years after his discharge from the Army. Plaintiff alleges that the Army failed to pay him the disability retirement pay due to him under 10 U.S.C. § 1201 (2012) as a member of the United States military who was physically disabled and unable to perform his duties. In his complaint, plaintiff requests that the court reverse the decision of the PDBR and revise plaintiff's record so as to indicate that plaintiff was medically retired and eligible for disability retirement pay. Plaintiff alleges that, at the time he signed the April 11, 2008 memorandum withdrawing his request for a formal PEB, he "was suffering from tremendous stress and didn't full[y] understand the process due to his cognitive difficulties" and that "[h]e did not understand that a 30% rating was required for a medical retirement." Plaintiff further alleges that he "clearly was not in a proper state of mind to make a decision to challenge the PEB rating" and that "[h]e wanted to return home as quickly as possible, seeking comfort from his family." Defendant filed a motion to dismiss, arguing a lack of subject matter jurisdiction because the statute of limitations has run and plaintiff cannot demonstrate that the statute should be tolled. Plaintiff filed a response to defendant's motion to dismiss, arguing that the claim should start to run on the date of decision of the PDBR, not at the time of discharge, and alternatively, that the "statute of limitations should be equitably tolled based on Plaintiff's mental health condition."

## DISCUSSION

Defendant moves to dismiss plaintiff's complaint as barred by the statute of limitations, and, therefore, outside of the subject matter jurisdiction of the court. It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. at 514 (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either

---

[6] The February 28, 2014 decision states that the ten percent rating for plaintiff's "painful scar" was "continued." There is, however, no evidence in the record that plaintiff had previously received a rating from the VA for the pain associated with his scar.

overlook or elect not to press." Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434 (2011); see also Gonzalez v. Thaler, 132 S. Ct. 641, 648 (2012) ("When a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented."); Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990)); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "Objections to a tribunal's jurisdiction can be raised at any time, even by a party that once conceded the tribunal's subject-matter jurisdiction over the controversy." Sebelius v. Auburn Reg'l Med. Ctr., 133 S. Ct. 817, 824 (2013); see also Arbaugh v. Y & H Corp., 546 U.S. at 506 ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment."); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506–07)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011). In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise *sua sponte*, even where . . . neither party has raised this issue." Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006); see also Avid Identification Sys., Inc. v. Crystal Import Corp., 603 F.3d 967, 971 (Fed. Cir.) ("This court must always determine for itself whether it has jurisdiction to hear the case before it, even when the parties do not raise or contest the issue."), reh'g and reh'g en banc denied, 614 F.3d 1330 (Fed. Cir. 2010), cert. denied, 131 S. Ct. 909 (2011).

"Determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir.) (citing Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1 (1983)), reh'g denied (Fed. Cir. 1997); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 208 (2011); Gonzalez-McCaulley Inv. Grp., Inc. v. United States, 93 Fed. Cl. 710, 713 (2010). A plaintiff need only state in the complaint "a short and plain statement of the grounds for the court's jurisdiction," and "a short and plain statement of

the claim showing that the pleader is entitled to relief." RCFC 8(a)(1), (2) (2016); Fed. R. Civ. P. 8(a)(1), (2) (2016); see also Ashcroft v. Iqbal, 556 U.S. 662, 677–78 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–57, 570 (2007)). However, "[c]onclusory allegations of law and unwarranted inferences of fact do not suffice to support a claim." Bradley v. Chiron Corp., 136 F.3d 1317, 1322 (Fed. Cir. 1998); see also McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1363 n.9 (Fed. Cir. 2007) (Dyk, J., concurring in part, dissenting in part) (quoting C. Wright and A. Miller, Federal Practice and Procedure § 1286 (3d ed. 2004)). "A plaintiff's factual allegations must 'raise a right to relief above the speculative level' and cross 'the line from conceivable to plausible.'" Three S Consulting v. United States, 104 Fed. Cl. 510, 523 (2012) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555), aff'd, 562 F. App'x 964 (Fed. Cir.), reh'g denied (Fed. Cir. 2014). As stated in Ashcroft v. Iqbal, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' 550 U.S. at 555. Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Ashcroft v. Iqbal, 556 U.S. at 678 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 555).

The Tucker Act grants jurisdiction to this court as follows:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1) (2012). As interpreted by the United States Supreme Court, the Tucker Act waives sovereign immunity to allow jurisdiction over claims against the United States (1) founded on an express or implied contract with the United States, (2) seeking a refund from a prior payment made to the government, or (3) based on federal constitutional, statutory, or regulatory law mandating compensation by the federal government for damages sustained. See United States v. Navajo Nation, 556 U.S. 287, 289–90 (2009); United States v. Mitchell, 463 U.S. 206, 216 (1983); see also Greenlee Cnty., Ariz. v. United States, 487 F.3d 871, 875 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2007), cert. denied, 552 U.S. 1142 (2008); Palmer v. United States, 168 F.3d 1310, 1314 (Fed. Cir. 1999).

"Not every claim invoking the Constitution, a federal statute, or a regulation is cognizable under the Tucker Act. The claim must be one for money damages against the United States . . . ." United States v. Mitchell, 463 U.S. at 216; see also United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003); Smith v. United States, 709 F.3d 1114, 1116 (Fed. Cir.), cert. denied, 134 S. Ct. 259 (2013); RadioShack Corp. v. United States, 566 F.3d 1358, 1360 (Fed. Cir. 2009); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d at 1343 ("[P]laintiff must . . . identify a substantive source of law that creates the right to recovery of money damages against the United States."); Golden v. United States, 118 Fed. Cl. 764, 768 (2014). In Ontario Power Generation, Inc. v. United States, the United States Court of Appeals for the Federal Circuit identified three types of monetary claims for which jurisdiction is lodged in the United States Court of Federal Claims. The court wrote:

8

> The underlying monetary claims are of three types. . . . First, claims alleging the existence of a contract between the plaintiff and the government fall within the Tucker Act's waiver. . . . Second, the Tucker Act's waiver encompasses claims where "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum." Eastport S.S. [Corp. v. United States, 178 Ct. Cl. 599, 605–06,] 372 F.2d [1002,] 1007-08 [(1967)] (describing illegal exaction claims as claims "in which 'the Government has the citizen's money in its pocket'" (quoting Clapp v. United States, 127 Ct. Cl. 505, 117 F. Supp. 576, 580 (1954)) . . . . Third, the Court of Federal Claims has jurisdiction over those claims where "money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." Eastport S.S., 372 F.2d at 1007. Claims in this third category, where no payment has been made to the government, either directly or in effect, require that the "particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." Id.; see also [United States v. ]Testan, 424 U.S. [392,] 401-02 [1976] ("Where the United States is the defendant and the plaintiff is not suing for money improperly exacted or retained, the basis of the federal claim-whether it be the Constitution, a statute, or a regulation-does not create a cause of action for money damages unless, as the Court of Claims has stated, that basis 'in itself . . . can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.'" (quoting Eastport S.S., 372 F.2d at 1009)). This category is commonly referred to as claims brought under a "money-mandating" statute.

Ontario Power Generation, Inc. v. United States, 369 F.3d 1298, 1301 (Fed. Cir. 2004); see also Twp. of Saddle Brook v. United States, 104 Fed. Cl. 101, 106 (2012).

To prove that a statute or regulation is money-mandating, a plaintiff must demonstrate that an independent source of substantive law relied upon "'can fairly be interpreted as mandating compensation by the Federal Government.'" United States v. Navajo Nation, 556 U.S. at 290 (quoting United States v. Testan, 424 U.S. 392, 400 (1976)); see also United States v. White Mountain Apache Tribe, 537 U.S. at 472; United States v. Mitchell, 463 U.S. at 217; Blueport Co., LLC v. United States, 533 F.3d 1374, 1383 (Fed. Cir. 2008), cert. denied, 555 U.S. 1153 (2009). The source of law granting monetary relief must be distinct from the Tucker Act itself. See United States v. Navajo Nation, 556 U.S. at 290 (The Tucker Act does not create "substantive rights; [it is simply a] jurisdictional provision[] that operate[s] to waive sovereign immunity for claims premised on other sources of law (e.g., statutes or contracts)."). "'If the statute is not money-mandating, the Court of Federal Claims lacks jurisdiction, and the dismissal should be for lack of subject matter jurisdiction.'" Jan's Helicopter Serv., Inc. v. Fed. Aviation Admin., 525 F.3d 1299, 1308 (Fed. Cir. 2008) (quoting Greenlee Cnty., Ariz. v. United States, 487 F.3d at 876); Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (The absence of a money-mandating source is "fatal to the court's jurisdiction under the Tucker Act."); Peoples v. United States, 87 Fed. Cl. 553, 565–66 (2009).

9

Although the Tucker Act waives federal sovereign immunity and grants this court jurisdiction to hear monetary claims against the government, this court's jurisdiction is expressly limited by 28 U.S.C. § 2501 (2012), which prescribes a six-year statute of limitations for claims arising under the Tucker Act's waiver of sovereign immunity.

According to 28 U.S.C. § 2501:

Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues. . . . A petition on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases.

Id. "The six-year statute of limitations set forth in section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims." John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1354 (Fed. Cir.), reh'g en banc denied (Fed. Cir. 2006), aff'd, 552 U.S. 130 (2008); Schnell v. United States, 115 Fed. Cl. 102, 104-05 (2014). The United States Court of Appeals for the Federal Circuit has indicated that a claim accrues "'"when all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money."'" San Carlos Apache Tribe v. United States, 639 F.3d 1346, 1358-59 (Fed. Cir.) (quoting Samish Indian Nation v. United States, 419 F.3d 1355, 1369 (Fed. Cir. 2005) (quoting Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003), cert. denied, 540 U.S. 1177 (2004))), reh'g en banc denied (Fed. Cir. 2011); see also FloorPro, Inc. v. United States, 680 F.3d 1377, 1381 (Fed. Cir. 2012); Martinez v. United States, 333 F.3d at 1303) ("A cause of action cognizable in a Tucker Act suit accrues as soon as all events have occurred that are necessary to enable the plaintiff to bring suit, *i.e.*, when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'" (quoting Nager Elec. Co. v. United States, 177 Ct. Cl. 234, 240, 368 F.2d 847, 851 (1966), motion denied, 184 Ct. Cl. 390, 396 F.2d 977 (1968)); Mildenberger v. United States, 643 F.3d 938, 944-45 (Fed. Cir. 2011); Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988); see also Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 481 (2013); Brizuela v. United States, 103 Fed. Cl. 635, 639, aff'd, 492 F. App'x 97 (Fed. Cir. 2012), cert. denied, 133 S. Ct. 1645 (2013); see also Levy v. United States, 83 Fed. Cl. 67, 73, 79 (2008) (dismissing a claim for military reserve retirement benefits because suits against the United States are subject to a six-year statute of limitations and the claim was filed outside the allotted timeframe); Barney v. United States, 57 Fed. Cl. 76, 83, 86 (2003) (dismissing former Airman's claims for wrongful discharge/unpaid wages and disability retirement because they were time-barred by the six-year statute of limitations). A Judge of the United States Court of Federal Claims has noted that:

It is well-established that a claim accrues under section 2501 "when 'all events have occurred to fix the Government's alleged liability, entitling the claimant to demand payment and sue here for his money.'" Martinez v. United States, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc), cert. denied, 540 U.S. 1177 (2004) (quoting Nager Elec. Co. v. United States, 368 F.2d

10

847, 851 (Ct. Cl. 1966)); see also Samish [Indian Nation v. United States], 419 F.3d [1355,] 1369 [(2005)]. Because, as noted, this requirement is jurisdictional, plaintiff bears the burden of demonstrating that its claims were timely. See Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998); Entines v. United States, 39 Fed. Cl. 673, 678 (1997), aff'd, 185 F.3d 881 (Fed. Cir.), cert. denied, 526 U.S. 1117 (1999); see also John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1362 (Fed. Cir. 2006) (Newman, J., dissenting); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).

Parkwood Assocs. Ltd. P'ship v. United States, 97 Fed. Cl. 809, 813-14 (2011), aff'd, 465 F. App'x 952 (Fed. Cir. 2012); see also Klamath Tribe Claims Comm. v. United States, 97 Fed. Cl. 203, 209 (2011) (citing Alder Terrace, Inc. v. United States, 161 F.3d 1372, 1377 (Fed. Cir. 1998)). Accrual of a claim is "'determined under an objective standard'" and plaintiff does not have to possess actual knowledge of all the relevant facts in order for a cause of action to accrue. FloorPro, Inc. v. United States, 680 F.3d at 1381 (quoting Fallini v. United States, 56 F.3d 1378, 1380 (Fed. Cir. 1995), cert. denied, 517 U.S. 1243 (1996)).

Defendant argues that plaintiff's cause of action for disability retirement pay accrued on or before the day plaintiff was discharged from the Army, June 19, 2008, over six years before plaintiff filed his complaint. In support, defendant cites to case law indicating that a PEB decision is sufficient to trigger the statute of limitations, including Real v. United States, 906 F.2d 1557, Fuller v. United States, 14 Ct. Cl. 542 (1988), Sabree v. United States, 90 Fed. Cl. 683 (2009), aff'd, 409 F. App'x 339 (Fed. Cir. 2011), and Schmidt v. United States, 89 Fed. Cl. 111 (2009). Defendant also points out that, prior to his discharge, plaintiff had several Medical Board assessments as well as a PEB. Defendant cites to Chambers v. United States, 417 F.3d 1218, 1224 (Fed. Cir. 2005), for the proposition that the plaintiff's seeking of review of his disability rating from the PDBR in 2013 does not change this result because such review "neither extends nor resets the running of the limitations period." Plaintiff argues, however, that his cause of action did not accrue until March 20, 2014, the date of the PDBR's decision, because the PDBR rather than the PEB was "the first competent Board of review in this case." In support of this argument, plaintiff cites to Real v. United States.

"The generally accepted rule is that claims of entitlement to disability retirement pay do not accrue until the appropriate board either finally denies such a claim or refuses to hear it." Id. at 1560 (citing Friedman v. United States, 159 Ct. Cl. 1 (1962), cert. denied, 373 U.S. 932, (1963)). "The decision by the first statutorily authorized board which hears or refuses to hear the claim is the triggering event." Real v. United States, 906 F.2d at 1560. "Therefore, if at the time of discharge, the service member requested review by an appropriate board and the request was denied, or if the board heard the service member's claim and denied it, then the limitations period begins to run upon discharge." Chambers v. United States, 417 F.3d at 1225, (citing Real v. United States, 906 F.2d at 1560). "A subsequent petition to the corrections board does not toll the running of the limitations period . . . , nor does a new claim accrue upon denial of the petition by the corrections

board . . . ." Real v. United States, 906 F.2d at 1560 (Fed. Cir. 1990) (citing Friedman v. United States, 159 Ct. Cl. at 14-15, 25-29).

If, however, a "service member had neither requested nor been offered consideration by a disability board prior to discharge . . . the later denial of his petition by a corrections board, not his discharge, triggers the statute of limitations," under "the general rule of Friedman [v. United states, 159 Ct. Cl. 1]." Chambers v. United States, 417 F.3d 1218, 1226 (Fed. Cir. 2005). There is, however, an exception to the Friedman rule, which is referred to as the "Real exception" after Real v. United States, 906 F.2d 1557. See Chambers v. United States, 417 F.3d at 1227. Under the Real exception, "there are circumstances under which the service member's failure to request a hearing board prior to discharge has been held to have the same effect as a refusal by the service to provide board review." Real v. United States, 906 F.2d at 1560 (citing Miller v. United States, 175 Ct. Cl. 871 (1966) and Huffaker v. United States, 2 Cl. Ct. 662 (1983)). Under such circumstances, the statute of limitations begins to run at discharge even absent the decision of a disability board to hear or deny the service member's claim. Id. at 1563. "Specifically, such failure can invoke the statute of limitations when the service member has sufficient actual or constructive notice of his disability, and hence, of his entitlement to disability retirement pay, at the time of discharge." Chambers v. United States, 417 F.3d at 1226 (citing Real v. United States, 906 F.2d at 1562). "Real thus framed the issue before it as '[w]hether the veteran's knowledge of the existence and extent of his condition at the time of his discharge was sufficient to justify concluding that he waived the right to board review of the service's finding of fitness by failing to demand a board prior to his discharge.'" Id. (quoting Real v. United States, 906 F.2d at 1562) (alteration in original). Such knowledge "must be determined by reference to the statutory requirements for entitlement" to disability benefits under 10 U.S.C. § 1201 (2012). Real v. United States, 906 F.2d at 1562.

In the present case, it is undisputed that plaintiff received a hearing regarding his alleged disability before an informal PEB prior to his discharge. When a plaintiff subsequently waives a formal PEB hearing, a decision by an informal PEB is sufficient to trigger the running of the statute of limitations on a disability retirement claim. See Gant v. United States, 417 F.3d 1328, 1329-30 (Fed. Cir. 2005) (finding that plaintiff's knowing and voluntary waiver of a formal PEB hearing through acceptance of an informal PEB's conclusions was sufficient to cause a claim to accrue); Schmidt v. United States, 89 Fed. Cl. at 120-21 ("An 'informal' CPEB [Central Physical Evaluation Board] decision is sufficient to start the running of the statute of limitations."); Fuller v. United States, 14 Ct. Cl. at 544 ("The PEB is a proper and competent tribunal whose decision is adequate to trigger the running of the statute of limitations."); Abatemarco v. United States, 226 Ct. Cl. 708, 710 (1981) ("Plaintiff's cause of action accrued in May 1972 because he had then demanded but been refused a Physical Evaluation Board, and was released without disability retirement pay."). Plaintiff's cause of action in the present case, therefore, accrued upon the date of his discharge from the Army, June 19, 2008. See Chambers v. United States, 417 F.3d at 1225 (citing Real v. United States, 906 F.2d at 1560). His subsequent petition to the PDBR did not serve to toll or re-start the running of the statute of limitations. See Real v. United States, 906 F.2d at 1560 (citing Friedman v. United States, 159 Ct. Cl. at 14-15, 25-29).

Plaintiff argues that, in his case, the PDBR, rather than the PEB, was plaintiff's "first competent Board of review," and, thus, that his cause of action did not accrue until after the PDBR issued its decision, on the grounds that his case "does not fall under the Real exception as he was not fully aware at the time of his separation that he was entitled to disability retirement due to a permanent disability." Plaintiff is not helped by Real v. United States. As noted above, the "exception" enunciated in Real v. United States is an exception to the rule of Friedman v. United States that the accrual of a service member's cause of action is tolled until he or she receives a hearing before a corrections board when a "service member ha[s] neither requested nor been offered consideration by a disability board prior to discharge." Chambers v. United States, 417 F.3d at 1226. In such cases, the Real exception looks to whether the service member had notice of his disability at the time of his discharge in order to determine "whether he waived his right to a board review" of the service's finding of fitness. Id. Both Friedman and Real, thus, concern situations in which a service member has not received hearing before a disability board prior to his discharge. Because plaintiff did receive such a hearing prior to his discharge, in the form of an informal PEB, neither the rule of Friedman nor the Real exception to that rule is applicable to plaintiff's case. Instead, as discussed above, the general rule that a service member's cause of action for disability retirement pay accrues upon his or her discharge from the armed services applies to plaintiff's case.

In plaintiff's response to defendant's motion to dismiss, plaintiff also states, without any elaboration, that the "statute of limitations should be equitably tolled based on Plaintiff's mental health condition." Defendant rejects the applicability of tolling to plaintiff's claim on the grounds that plaintiff's actions demonstrate that he comprehended and acted in defense of his legal rights at the time of his PEB and, thus, was not suffering a legal disability at the time his claim accrued as required by the tolling statute, 28 U.S.C. § 2501. Additionally, defendant argues that even if plaintiff could establish a legal disability at the time his claim accrued, numerous actions he took after that time, such as filing and pursuing his petitions for disability benefits with the VA, support the conclusion that he was conscientiously pursuing his legal rights, and, therefore, plaintiff cannot demonstrate that his disability was continuous during the period in which he seeks tolling.

The United States Supreme Court and the United States Court of Appeals for the Federal Circuit have held that equitable tolling is generally not available in Tucker Act cases. See John R. Sand & Gravel Co. v. United States, 552 U.S. 130, 134 (2008); Young v. United States, 529 F.3d 1380, 1384 (Fed. Cir. 2008). In John R. Sand & Gravel Co. v. United States, the United States Supreme Court articulated that the six-year limitations period in 28 U.S.C. § 2501 is jurisdictional in Tucker Act cases, "and not susceptible to equitable tolling." John R. Sand & Gravel Co. v. United States, 552 U.S. at 755. Although 28 U.S.C. § 2501 does not generally provide for equitable tolling, tolling for persons with a "legal disability," however, can be recognized. The statute at § 2501 provides, in pertinent part: "A petition on the claim of a person under legal disability . . . at the time a claim accrues may be filed within three years after the disability ceases." As stated in Goewey v. United States, "[t]he law presumes sanity and competency rather than insanity and incompetency." Goewey v. United States, 222 Ct. Cl. 104, 112 (1979). A plaintiff bears a heavy burden to demonstrate the existence of a disability. Id. The incompetency, "in order to qualify as a statutory 'legal disability,' must in some way prevent [the plaintiff's]

13

comprehension of his legal rights." See id. at 114 "Only a serious impediment can qualify to suspend the running of the statute." Id. at 113. To claim legal disability under this statute, plaintiff must be "incapable of caring for his property, of transacting business, of understanding the nature and effect of his acts, and of comprehending his legal rights and liabilities." Id. 114 Furthermore, participation in administrative or legal proceedings may indicate that the plaintiff comprehended his legal rights and did not suffer a lack of mental capacity. See id. at 116 ("Plaintiff's admitted incapability of managing his financial affairs, when set against his competence to stand trial, to understand adverse proceedings, to assist in his own defense, and to follow legal instructions in the furtherance of his own interests, does not on balance qualify him as being legally disabled . . . ."). A plaintiff claiming legal disability must also establish "that his disability existed at the time when the claim accrued rather than arising some time thereafter and that he suffered from the disability continually during the period in which the statute is to be tolled." Ware v. United States, 57 Fed. Cl. 782, 788 (2003) (citing Bond v. United States, 43 Fed. Cl. 346, 349 (1999)); see 28 U.S.C. § 2501 ("A petition on the claim of a person under legal disability . . . at the time the claim accrues may be filed within three years after the disability ceases." (emphasis added)). "The general rule is that after the termination of a legal disability the statute of limitations commences to run and the tolling is not reinstated by a recurrence of the disability." Goewey v. United States, 222 Ct. Cl. at 116 (citing De Arnaud v. United States, 151 U.S. 483 (1894); McDonald v. Hovey, 110 U.S. 619, 621 (1884); Oliver v. Pullam, 24 F. 127 (C.C.N.C.1885)).

There is evidence in the record that Mr. Jeun suffered difficulties as a result of his ruptured dermoid cyst in March 2007 and subsequent surgery in April 2007. In May 2007, Dr. Theeler diagnosed plaintiff with Medial Frontal Lobe Syndrome and found that he did not meet the military's retention standards. Dr. Pincus made similar diagnoses as late as August, September, and October 2007. Plaintiff went AWOL for three weeks in October 2007 due to what Dr. Pincus termed "a misunderstanding secondary to his clinical condition." In February 2008, the MEB diagnosed plaintiff with "1. Cognitive disorder NOS . . . . 2. Psychotic NOS. . . . 3. Medial Frontal Lobe Syndrome Secondary to ruptured intracranial dermoid cyst. . . . 4. Depressive disorder. . . ." There is also evidence in the record, however, that plaintiff's difficulties had begun to abate by the time he was evaluated by the informal PEB. In particular, Dr. Pincus noted, as early as August 2007, that plaintiff's psychosis and depression were "resolved," and the informal PEB came to the conclusion that plaintiff's psychosis was, as of April 2008, "[t]reated and now completely resolved."

Despite evidence in the record of plaintiff's difficulties prior to his PEB, there is strong evidence in the record that plaintiff was capable of comprehending his legal rights at the time of the PEB's decision. In particular, upon receiving the informal PEB decision, plaintiff indicated, by checking off boxes and signing at the end of a document, that he did not concur with the findings, that he wished to appeal the decision before a formal PEB, and that he requested legal counsel to assist in his appeal. Less than a month later, and after meeting with an attorney, plaintiff signed a memorandum withdrawing his appeal which included several statements which evidenced his understanding of his circumstances and legal rights. Specifically, plaintiff stated:

14

1. Pursuant to AR 635-40, paragraph 4-21a, and after discussing my options with my legal counsel, I hereby withdraw my demand for the formal Physical Evaluation Board (PEB) hearing scheduled for 11 April 2008.

2. I do not contest the Informal PEB rating of 10%.

3. Pursuant to AR 635-40, paragraph 4-20f (2), should I discover any new or additional evidence, I reserve the right to submit a request for reconsideration.

Additionally, plaintiff admits in his complaint that he withdrew his appeal of the informal PEB's decision after discussing his options with legal counsel and realizing, in plaintiff's own words, that "a formal hearing would delay his discharge from the Army." Plaintiff admits that he sought to avoid such a delay because "[h]e wanted to return home as quickly as possible, seeking comfort from his family." Similarly, a note from plaintiff's Warrior Transition Battalion Nurse Case Manager on April 18, 2008, between plaintiff's withdrawal of appeal and his discharge, stated:

[Plaintiff] was questioned why he changed his mind in deciding not to continue to formally appeal his Board. [Plaintiff] was given various possible outcomes that could result from his continuing with his formal appeal; possibly found fit for duty and possibly lose the present PEB election offer. [Plaintiff] did not want to be found fit for duty and remain in the Army and be delayed in his returning home and decided to decline the formal board hearing.

Plaintiff's case, thus, is analogous to two of the cases cited by defendant, Goewey v. United States, 222 Ct. Cl. 104 and Sabree v. United States, 90 Fed. Cl. 683. The plaintiff in Goewey, Mr. Goewey, was discharged in 1951 and given care in a mental hospital until 1965. Goewey v. United States, 222 Ct. Cl. at 108-09. He filed suit for military disability retirement pay in 1973, which would have been past the six-year statute of limitations for a claim accruing in 1965. See id. Mr. Goewey alleged that his military disability claim should be tolled because he was suffering from a legal disability under 28 U.S.C. § 2501. Id. at 110. Despite a history of mental illness, which included diagnoses of obsessive compulsive disorder and depression, and, later, latent schizophrenia and obsessive compulsive personality with sociopathic and depressive features, the court found that during his "lucid periods" Mr. Goewey "was fully capable of having the wit and the will to file a timely suit." Id. at 116. In particular, the court noted that, during the time period that Mr. Goewey claimed he was mentally incompetent, he had participated in efforts to obtain a release from a psychiatric hospital, endeavored to secure VA benefits for himself and his family, cooperated with lawyers in defending his criminal prosecutions, and drafted correspondence affecting his own interests. Id. at 114-15. Based on these activities, the United States Court of Claims in Goewey held that Mr. Goeway's efforts "ma[de] it abundantly clear that plaintiff was able to understand such complexities and was decidedly not adverse to protecting his interests to the utmost" and, thus, not suffering from a legal disability. Id.

In <u>Sabree v. United States</u>, a decision of the undersigned judge, a PEB found Mr. Sabree unfit for service after an automobile accident, and he was discharged due to physical disability. See <u>Sabree v. United States</u>, 90 Fed. Cl. at 688. Upon receiving his disability rating, Mr. Sabree attempted to bargain a deal for temporary retirement, but the PEB declined to entertain plaintiff's offer and discharged him with severance pay. <u>Id.</u> More than twenty years after discharge, Mr. Sabree filed an application with the Army Board for Correction of Military Records, and, twenty-six years after discharge, he filed a complaint in the United States Court of Federal Claims. <u>Id.</u> at 689. Sabree argued that he was legally disabled, and that the statute of limitations should be tolled, "because he suffered from 'mental illness,' including 'major depression' and prescription drug abuse." <u>Id.</u> at 687. The court noted, however, that during the period Mr. Sabree alleged he was disabled he had "completed agency forms, applied for benefit increases with the VA, cooperated with legal counsel during his administrative proceedings, and drafted his own rebuttal statements, all in the furtherance of his own interests." <u>Id.</u> Based on this evidence, the court found that Mr. Sabree had "failed to demonstrate that during the statute of limitations period, when he could have pursued his claims, he was unable 'to understand adverse proceedings, to assist in his own defense, and to follow legal instructions in the furtherance of his own interests.'" <u>Id.</u> at 698 (quoting <u>Goewey v. United States</u>, 222 Ct. Cl. at 114-15). The court concluded that Mr. Sabree, therefore, was "capable of comprehending his legal rights during the time that the statute of limitations was running," and, as such, he had failed to demonstrate a legal disability. <u>Id.</u>

The <u>Goewey</u> and <u>Sabree</u> cases reflect a standard by which legal disability is weighed based on evidence in the record before the court. Evidence that a plaintiff understands his or her legal rights, such as participation in administrative or legal proceedings, cooperating with legal counsel, and drafting correspondence, may be significant in determining mental competency. See <u>id.</u>; <u>Goewey v. United States</u>, 222 Ct. Cl. at 115. As in <u>Goewey</u> and <u>Sabree</u>, Mr. Jeun was diagnosed with certain medical and psychological issues during the time in question. However, also as in <u>Goewey</u> and <u>Sabree</u>, Mr. Jeun participated in his administrative discharge proceedings and, subsequently, disability proceedings at the VA, demonstrating that plaintiff was not unable to understand the nature of the proceedings in question. Plaintiff's actions and the administrative record do not adequately demonstrate plaintiff's incompetence at the time that the claim accrued when he was discharged and subsequently. Accordingly, the statute of limitations did not toll due to legal disability under 28 U.S.C. § 2501.[7]

---

[7] The court notes that, although defendant has not argued in its present motion that plaintiff has waived his right to challenge the PEB's decision, in its February 1, 2016 answer to plaintiff's complaint, defendant listed as an affirmative defense that "[t]o the extent plaintiff challenges decisions made by the Physical Evaluation Board on March 3, 2008, plaintiff waived his right to challenge that decision." "Plaintiff's voluntary waiver of a formal PEB precludes judicial review of the informal PEB's determination." <u>Van Cleave v. United States</u>, 66 Fed. Cl. 133, 136 (2005) (citing <u>Gant v. United States</u>, 63 Fed. Cl. 311, 318 (2004), <u>aff'd</u> 417 F.3d 1328 (Fed. Cir. 2005)). "By waiving a formal hearing, plaintiff prevented [the Army] from itself having an opportunity to entertain any claim or objection and to develop a full record that this court now could review." <u>Gant v. United

## **CONCLUSION**

Plaintiff's claim accrued on his date of discharge, June 18, 2008, more than six years before plaintiff filed his complaint in this court on December 1, 2015, and plaintiff has failed to provide evidence to show that the statute of limitations for his claim should be tolled. As such, plaintiff's claims for disability retirement pay were filed beyond the expiration of the applicable statute of limitations. This court, therefore, lacks jurisdiction to hear plaintiff's claim, and the claim must be dismissed. Defendant's motion to dismiss is **GRANTED**. Plaintiff's complaint is **DISMISSED**. The clerk's office shall enter **JUDGMENT** consistent with this opinion.

**IT IS SO ORDERED.**

                s/Marian Blank Horn
                **MARIAN BLANK HORN**
                **Judge**

---

States, 63 Fed. Cl. at 318. The Army, "effectively was deprived of the opportunity to correct its own errors—if they ever existed. Agencies must have these opportunities." Id. (citing United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37, (1952); Stewart v. United States, 222 Ct. Cl. 42, 52, 611 F.2d 1356, 1361 (1979)).

In his April 11, 2007 "Withdrawal of Demand for Formal Hearing" memorandum, plaintiff stated that he "d[id] not contest the Informal PEB rating of 10%" and withdrew his demand for a formal PEB hearing. Nothing in plaintiff's complaint or the record before the court indicates that this decision to waive his right to a formal PEB was involuntary. Indeed, plaintiff states in his complaint that he decided to do so because "[h]e wanted to return home as quickly as possible, seeking comfort from his family." Thus, even if the court were to have jurisdiction to hear plaintiff's claim, to the extent that plaintiff challenges the findings of the PEB, plaintiff appears to have waived his right to do so.